**UNITED STATES of America, Appellee,**

v.

**Luis A. ALICEA–CARDOZA,
Defendant, Appellant.**

No. 97–1139.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1997.

Decided Dec. 19, 1997.

Rafael Anglada–Lopez, Hato Rey, PR, for appellant.

Miguel A. Pereira–Castillo, U.S. Department of Justice, with whom Guillermo Gil, United States Attorney, Washington, DC, and Jose A. Quiles–Espinosa, Senior Litigation Counsel, San Juan, PR, were on brief, for appellee.

Before TORRUELLA,Chief Judge , CYR, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

A cocaine distribution conspiracy out of the Virgilio Dávila Public Housing Project in Bayamón, Puerto Rico led to the indictment of thirty-six defendants. Twenty-five pled guilty either before trial or shortly after trial started. Eight defendants were tried to verdict, five were acquitted.

Luis Alicea–Cardoza, nicknamed "Burbuja", was one of the three convicted and now appeals. His main contention is that the jury, confronted with a maze of defendants and drug and violence evidence, convicted him when there was precious little evidence, too little, he says, to support a conviction. The little evidence there was, he says, was based on beeper transmissions and this court, which has not previously addressed the question, should find those beeper records erroneously admitted. Although Alicea–Cardoza has ably argued these and ancillary points, we affirm his conviction under 21 U.S.C. § 841 and the drug conspiracy statute, 21 U.S.C. § 846, and his sentence of 27 years imprisonment.

## I

Because the defendant attacks the sufficiency of the evidence, we review the evidence in the light most favorable to the verdict, with a view to whether a rational juror could have found guilt beyond a reasonable doubt. *See United States v. Cruz*, 981 F.2d 613, 615 (1st Cir.1992).

Interception of telephone messages in April 1994 confirmed that Jorge Solano–Moreta was in charge of an organization selling drugs, principally cocaine, at numerous drug points in Bayamón, including a drug point at the Virgilio Dávila Housing Project. Alicea–Cardoza had acted as a "runner" (meaning that he managed the business operation by receiving, accounting for, and safeguarding the proceeds of drug sales) for a Virgilio Dávila drug point since 1992. Approximately four kilograms of cocaine were sold monthly at that drug point. Alicea–Cardoza was also a runner for another drug point in the Virgilio Dávila Housing Project. There, approximately one half of a kilogram of cocaine base was sold monthly.

The evidence implicating Alicea–Cardoza in the conspiracy consisted principally of the testimony of Amiud Alicea–Matías and charts of intercepted beeper messages sent to Solano–Moreta by Alicea–Cardoza. Alicea–Matías testified that he was part of a drug selling organization at the Virgilio Dávila Housing Project known as the Virgilio Dávila group, which sold cocaine, crack, and heroin. Alicea–Matías said he ran several drug points and was a trigger man for the group. He testified that the members of the group included Luis Rosario–Rodríguez, Richard Rosario–Rodríguez and Edwin Rosario–Rodríguez (three brothers who ran the group), Felipe García–Roque, as well as defendant "Luis Alicea, [and] some people who are confined in state institutions." When asked, " ... do you know if Ruiz [sic] Alicea has a nickname or nicknames," Alicea–Matías responded, "Burbuja". When asked whether "Luis Alicea–Cardoza, also known as Burbuja" was seated in the courtroom, Alicea–

Matías identified Alicea–Cardoza. And when asked "How many Burbujas worked for this organization or group," Alicea–Matías responded, "Just one Burbuja." "Burbujas" means "Bubbles" and members of the jury, applying their common experience of Puerto Rican society, could reasonably have regarded it as an unusual male nickname. No evidence was presented to suggest that another "Burbuja" may have been involved in this organization.

Alicea-Matías testified that the Virgilio Dávila group and Solano–Moreta "established a solid relationship" during 1992 and 1993 to help each other fight "wars" against competing groups for control of the local drug trade. Solano–Moreta and the Virgilio Dávila group would meet to discuss drug points and plan attacks against enemies of both groups, pooling their resources "in order to be strong." They also did business with each other: Solano–Moreta sold kilos of drugs to the Virgilio Dávila group, which in turn sold the drugs throughout the Virgilio Dávila Housing Project. In addition, the Virgilio Dávila group collected money for Solano–Moreta at drug points owned by him and took the money to him. They even committed murders with Solano–Moreta to enforce their control over the drug trade. The two groups developed a "frequent and close friendship" and "[met] on many occasions." When asked who attended these meetings, Alicea–Matías responded:

> Richard Rosario–Rodríguez, Edwin Rosario–Rodríguez, I, Willy Nariz, [Jorge] Solano Moreta, Perla. When [Jorge] would come down to the Virgilio Dávila Housing Project, Luis Rosario–Rodríguez was there. *Luis Rosario–Rodríguez [sic], alias Burbuja,* and several other people who are jailed at the state institution.[1]

(emphasis added).

In addition to this testimony, Alicea–Cardoza was implicated by charts the government prepared of beeper messages. These charts recorded the content of approximately four thousand messages received between April 26, 1995 and June 5, 1995 by Solano–

---

1. Alicea-Matías seemed to have mistakenly repeated the name Luis Rosario–Rodríguez. The jury could have concluded this was an inadvertent mistake, rather than evidence of a different

"Burbuja", especially in light of Alicea-Matías's direct identification of Alicea–Cardoza as the real "Burbuja".

Moreta on his beepers. The messages were intercepted by federal agents pursuant to court authorization. Special Agent Gilberto Vazquez, who directed the investigation, testified that the charts transcribing the messages sent to Solano–Moreta were produced by a pen register, which intercepted the messages sent to Solano–Moreta's beeper and printed them out. Vazquez also testified that he tested the pen register system for accuracy by checking its results against the messages received by a clone beeper, an exact replica of Solano's beeper. He testified that the pen register and clone beeper received exactly the same messages received by Solano–Moreta.

Several hundred of the messages to Solano–Moreta recorded in the beeper charts were from "Burbuja". Typical were messages asking Solano–Moreta to call "Burbuja" at a certain phone number or messages leaving a phone number accompanied by "Burbuja, Urgente." Some messages referred to obtaining "work". Vazquez testified that, in his considerable experience investigating drug gangs, these and other messages received by Solano–Moreta involved the drug trade.

Of the five members of the Virgilio Dávila group who originally went to trial, only Alicea–Cardoza was convicted.

## II

Alicea-Cardoza claims the district court admitted the beeper charts without proper authentication under Fed.R.Evid. 901, that the evidence was insufficient to support his conviction, and that he was subject to a constructive amendment to the indictment.

### A. *Beeper Charts*

 Under Fed.R.Evid. 901(a), "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). To establish authenticity, the proponent need not rule out "all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be.

Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir.1994). Generally, if the district court is satisfied that the evidence is sufficient to allow a reasonable person to believe the evidence is what it purports to be, Rule 901(a) is satisfied and the jury may decide what weight it will give the evidence. *See id.* at 167. Because authentication rulings are necessarily fact specific, we review such rulings only for mistake of law or abuse of discretion. *See id.*

The district court did not abuse its discretion in admitting the beeper charts as a record of the messages sent to Solano–Moreta's beeper. Vazquez adequately explained the means by which the pen register intercepted and recorded the beeper messages, and how the clone beeper confirmed the accuracy of that system. Asked by the prosecution how the beeper charts had been produced, Vazquez responded, "It is a machine known as a pen register. As the message comes in the pen register just annotates or writes exactly what comes out on the beeper." Vazquez explained clone beepers. "A clone is an exact replica of a beeper. If I was going to have a clone to my beeper and you had it, you would receive exactly the same message that I get." Vazquez testified that he carried a clone of Solano–Moreta's beeper for about a week during the intercept period. Asked whether Vazquez found any difference between the written messages produced by the pen register and those received by the clone beeper, Vazquez responded, "No difference." This testimony was not contradicted or challenged by the defense.

 Alicea-Cardoza's argument is that the charts of these phone calls were not properly authenticated because there was no evidence that Alicea–Cardoza was in fact the person who left the messages. Defendant relies on the general rule that self-identification by a speaker alone is not sufficient authentication. *See United States v. Puerta Restrepo*, 814 F.2d 1236, 1239 (7th Cir.1987); *United States v. Pool*, 660 F.2d 547, 560 (5th Cir. Unit B Nov. 1981). We agree that, under *Puerta Restrepo* and *Pool*, the beeper charts could not be authenticated under Rule

901 were they being offered for the sole purpose of identifying Alicea–Cardoza as the "Burbuja" who sent the messages.

Here, however, the government's evidence only showed the beeper messages that Solano–Moreta himself had received, not who specifically had sent them. This is not a case of the jury being asked to take on faith that a caller was who the witness said the caller was. Rather, the charts were introduced for the different purpose of proving that Solano–Moreta received these messages on his beeper, and the beeper charts plainly constitute an accurate record of the messages that Solano–Moreta received. As Vazquez testified, a beeper decodes a digital message which it displays on its screen, e.g., "Call Burbuja." The pen register intercepts that message and records it, over time producing a complete record of all messages sent to that beeper. That these beeper charts produced by the pen register are an accurate record of the messages sent to Solano–Moreta's beeper was established by the testimony of Vazquez, who explained that the beeper charts were checked against a clone beeper and that there was no difference between the two. This testimony was sufficient to authenticate the beeper charts as records of the messages sent to Solano–Moreta's beeper.

Whether the "Burbuja" who sent the messages was Alicea–Cardoza is a separate question not within the purview of Rule 901. The jury had to decide on its own, taking into account other evidence, some direct and some circumstantial, whether Alicea–Cardoza was "Burbuja". Given that evidence, the jury reasonably established that "Burbuja" was a member of the drug ring and that "Burbuja" was, in fact, Alicea–Cardoza.

It is true that someone who was not "Burbuja" could have been leaving the messages or that some other person named "Burbuja" left the messages. Alicea–Cardoza did not make such a contention at trial, but if he had, such a contention does not go to whether the beeper charts are properly authenticated. The jury could still have assessed the weight of the evidence in light of that contention and made a judgment accordingly. In sum, whether the "Burbuja" who sent the messages is in fact Alicea–Cardoza, or perhaps some other "Burbuja", is a separate matter for the jury to decide.

As for the whether the charts were authenticated, the standard of reasonable likelihood was satisfied in this case.

### B. *Sufficiency*

■ Thus, we turn to the question whether the evidence in this case is sufficient to support Alicea–Cardoza's conviction. In assessing a sufficiency challenge, we "review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendant was guilty as charged." *United States v. Fulmer*, 108 F.3d 1486, 1490 (1st Cir.1997) (citations, internal quotation marks, and alterations omitted).

Taking the beeper charts and Alicea–Matías's testimony together, we conclude the evidence was sufficient. Alicea–Matías's testimony identifies Alicea–Cardoza as a member of the Virgilio Dávila group and links the drug-related enterprises of that group to those of Solano–Moreta. The testimony establishes that Alicea–Cardoza was "Burbuja". The beeper charts demonstrate that "Burbuja" had frequent contact with Solano–Moreta. And the jury could easily find that these communications involved matters related to the manufacture and sale of drugs. While it is possible that the "Burbuja" who sent those messages was indeed another "Burbuja", or that Alicea–Cardoza and Solano–Moreta had only a non-criminal relationship, the jury was not required to accept either of these conclusions. To the contrary, the evidence clearly suggests that Alicea–Cardoza was closely involved with Solano–Moreta in the drug trade, and is plainly sufficient to sustain the conviction.

■ That the jury did not also convict other members of the Virgilio Dávila group based solely on Alicea–Matías's testimony does not undercut this conclusion. The jury may well have regarded Alicea–Matías's testimony as insufficient to prove the guilt of those other defendants beyond a reasonable

doubt, but this does not mean, as Alicea–Cardoza argues, that we must therefore accord Alicea–Matías's testimony no weight in considering this sufficiency claim. The jury could reasonably have found, as indeed it did, that Alicea–Matías's testimony in conjunction with the beeper charts proved Alicea–Cardoza's guilt beyond a reasonable doubt.

## C. *Constructive Variance*

■ Alicea-Cardoza claims that his conviction amounts to a constructive variance of the indictment in that (1) the indictment charges him with being a triggerman, but he was tried for being a runner, and (2) the evidence showed the existence of multiple conspiracies, while Alicea–Cardoza did not participate in the conspiracy for which he was convicted. Variances between the indictment and the evidence ultimately proved against a single defendant may be common when the government prosecutes large criminal enterprises in a single trial. *See United States v. Glenn,* 828 F.2d 855, 858 (1st Cir.1987). When constructive variance is alleged on appeal in a conspiracy case, under *Glenn* the following questions are asked:

> (1) Is the evidence sufficient to permit a jury to find the (express or tacit) agreement that the indictment charges? (2) If not, is it sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy? (3) If so, does the variance affect the defendant's substantial rights or does the difference between the charged conspiracy and the conspiracy proved amount to "harmless error?"

*Id.*

■ As to the first test, the evidence permits a jury to find that Alicea–Cardoza did conspire with Solano–Moreta to distribute drugs and that he was an active participant in that enterprise. Indeed, the beeper charts show that Alicea–Cardoza and Solano–Moreta were in frequent communication. Accordingly, that Alicea–Cardoza was indicted for being a conspirator/triggerman but the evidence proved him a conspirator/runner does not constitute impermissible variance. "So long as the statutory violation remains the same, the jury can convict even if the facts found are somewhat different than those charged—so long as the difference

does not cause unfair prejudice." *United States v. Twitty,* 72 F.3d 228, 231 (citing *Glenn,* 828 F.2d at 858). There is no unfair prejudice in this case. Alicea–Cardoza had notice that he was under indictment for being involved in the Solano–Moreta drug organization, and he knew that his central defense needed to be that he was not part of that organization—as a triggerman, runner, or in any other capacity. The error in the indictment was not so grave as to cause Alicea–Cardoza to defend himself on the wrong grounds, especially when the evidence adduced at trial showed Alicea–Cardoza to be deeply involved in the Solano–Moreta organization.

## III

■ The sentencing appeal is also without merit. The court assigned Alicea–Cardoza a base offense level of thirty-eight under U.S.S.G. § 2D1.1 for conviction of an offense involving at least 1.5 kilograms of cocaine base. The court increased the offense level by two points to forty under U.S.S.G. § 2D1.1(b)(1), adopting the findings of the presentence report that weapons were used by Alicea–Cardoza in furtherance of the conspiracy. The court declined to adopt the recommendation of the presentence report to raise Alicea–Cardoza's offense level by an additional three points, rejecting the report's finding that Alicea–Cardoza had a managerial role in the conspiracy. The court found an imprisonment range of 324 to 405 months, and sentenced Alicea–Cardoza to 324 months in prison, including a statutory minimum of ten years in jail under 21 U.S.C. § 841(b)(1)(A).

■ The government has the burden of proving drug quantity by a fair preponderance of the evidence, *see United States v. Morillo,* 8 F.3d 864, 871, and amply met its burden here. The evidence shows that the Solano–Moreta organization was a major drug distribution network buying and selling hundreds of kilograms of cocaine and cocaine base through various drug points, including those at the Virgilio Dávila Housing Project. The evidence shows that Alicea–Cardoza was a runner for those drug points at Virgilio Dávila. According to the presentence report, Alicea–Cardoza "ran" a drug point at which approximately four kilograms of cocaine were

sold monthly, he "ran" another drug point at which approximately one half kilogram of cocaine base was sold monthly. Given this evidence, the district court did not commit error in assigning Alicea–Cardoza a base offense level of thirty-eight for committing an offense involving 1.5 kilograms of cocaine base. This evidence at trial is sufficient to sustain the offense level. As to Alicea–Cardoza's attack on the two point increase in his offense level for use of a weapon, the evidence at trial shows that Alicea–Cardoza was armed when he served as a watchman for drug points in the Virgilio Dávila Housing Project. This is sufficient to sustain the increase.

The judgment of the district court is affirmed.