**UNITED STATES, Appellee,**

v.

**Confesor FALU–GONZALEZ, a/k/a Pepo, Defendant, Appellant.**

**No. 98–1749.**

United States Court of Appeals, First Circuit.

Heard Nov. 5, 1999.

Decided Feb. 17, 2000.

Rafael F. Castro–Lang for appellant.

Miguel A. Pereira, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, Jorge E. Vega–Pacheco, Chief Criminal Division, Nelson Pérez–Sosa and Michelle Morales, Assistant United States Attorneys were on brief, for appellee.

Before TORRUELLA, Chief Judge, CAMPBELL and WALLACE,* Senior Circuit Judges.

WALLACE, Senior Circuit Judge.

Confesor Falú–González was tried and convicted of conspiracy to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 841, 846. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. He timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

---

* Of the Ninth Circuit, sitting by designation.

## I.

In 1995, the government indicted thirty-seven persons for involvement in a drug conspiracy allegedly led by Wes Solano–Moreta. All but eight pled guilty shortly before or shortly after trial began. The jury acquitted five defendants and convicted three. We have affirmed the convictions of two, *United States v. Alicea–Cardoza*, 132 F.3d 1 (1st Cir.1997), and *United States v. Hernández–García*, No. 98–1750, 2000 WL 231251 (1st Cir.2000). This case considers the final convicted defendant's appeal.

In *Alicea–Cardoza*, we described the Solano–Moreta organization as "a major drug distribution network buying and selling hundreds of kilograms of cocaine and cocaine base through various drug points." 132 F.3d at 6. At his trial, witnesses testified that Falú–González supplied "kilos" of cocaine to the organization; that they saw him sell cocaine to Solano–Moreta; and that he spoke on the telephone with Solano–Moreta about the organization's activities.

## II.

■■■ Falú–González first argues that the district court erred in admitting, pursuant to Federal Rule of Evidence 801(d)(2)(E), the statement of a coconspirator that Solano–Moreta "purchased kilos" from Falú–González because the government failed to lay a proper foundation for the evidence. Rule 801(d)(2)(E) establishes that statements offered against a party are not hearsay if they are made "by a coconspirator of a party during the course and in furtherance of the conspiracy." The rule requires the district court to "find[ ] it 'more likely than not that the declarant and the defendant were members of a conspiracy ... and that the statement was in furtherance of the conspiracy.'" *United States v. Portela*, 167 F.3d 687, 702 (1st Cir.1999), *quoting United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977). This finding, known in this circuit as a *Petrozziello* determination, is typically made "'at the close of all the evidence' and 'out of the hearing of the jury.'" *Portela*, 167 F.3d at 702–03, *quoting United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir.1980). "Hearsay evidence may be admitted provisionally, subject to the trial court's final *Petrozziello* determination, ...." *Portela*, 167 F.3d at 702.

Amuid Alicea–Matías, one of several coconspirators who appeared on behalf of the government, testified that Solano–Moreta, the leader of the alleged drug organization, "purchased kilos" of cocaine from Falú–González. On cross-examination, Alicea–Matías admitted that he did not personally see Falú–González sell kilos to Solano–Moreta, but that Solano–Moreta told him so. At that point, Falú–González objected on the basis of lack of personal knowledge and moved to strike Alicea–Matías' testimony. The government argued that Rule 801(d)(2)(E) applied and that the testimony should be allowed. Falú–González did not object on foundational grounds. The district court allowed the evidence pursuant to Rule 801(d)(2)(E), subject to the *Petrozziello* determination it would make at the end of the trial.

After all evidence was presented, the district court held a *Petrozziello* hearing and allowed all counsel to discuss whether, based on the entire evidence, the numerous coconspirator statements provisionally admitted during trial should stand or be stricken from the record. Falú–González's counsel successfully objected to another coconspirator statement that was provisionally admitted against Falú–González, but did not object to the above statement of Alicea–Matías. The district court issued a broad ruling that all coconspirator statements provisionally admitted pursuant to Rule 801(d)(2)(E), with one exception not applicable here, met the *Petrozziello* test:

Specifically, with respect to each such statement, the Court finds by a preponderance of the available evidence that (1), a conspiracy existed as alleged by the government.

(2), that the declarant and the defendants against whom the statement has

been admitted ... were members of the conspiracy at the time that the statement was made.

(3), that the statement was made during the course of and in furtherance of that conspiracy.

■ Typically, we uphold a district court's ruling on the applicability of Rule 801(d)(2)(E) "unless it is clearly erroneous." *Portela,* 167 F.3d at 703, *citing Earle v. Benoit,* 850 F.2d 836, 842 (1st Cir.1988). Both parties submit that this is the appropriate standard of review.

Falú–González has not shown clear error in the admission of Alicea–Matías' testimony. Falú–González merely asserts that there "is absolutely nothing in the record to establish that the statements were made in furtherance of the conspiracy." Obviously, the district court found otherwise, and Falú–González's conclusory statements are insufficient to show error or clear error.

### III.

Falú–González next challenges the district court's sentencing finding that he was responsible for trafficking fifteen to fifty kilos of cocaine and two kilos of heroin, arguing it is unclear "how he arrived at that amount."

At sentencing, Falú–González objected to the amount of drugs for which the presentence report recommended he be found responsible: 1.5 kilograms of crack cocaine. The district court focused upon this factual issue at some depth, questioning the government about the types (including cocaine, crack cocaine, and heroin) and amounts of drugs (over 200 kilograms of cocaine, over 500 grams of heroin) trafficked in the conspiracy and what amounts of these drugs should be attributed to Falú–González based on his role in the conspiracy. The government's theory was that, in light of Falú–González's role as a supplier of cocaine and heroin to the Solano–Moreta organization, the large amounts of drugs that organization trafficked, and the testimony that Falú–González sold "kilos" of cocaine to Solano–Moreta, that the

cocaine was probably made into crack cocaine and it was reasonable to conclude that Falú–González distributed at least 1.5 kilograms of crack cocaine, corresponding to a base offense level of 38.

The district court did not adopt the government's theory. Rather, after taking the matter under advisement for a short time, the district court found that

the evidence at trial shows that the defendant was a drug supplier of cocaine and heroin to the Solano Moreta organization, and that the conspiracy involved hundreds of kilos of drugs, including cocaine and heroin.

Taking into consideration all of the evidence received by the Court at trial, as well as the evidence that has been reviewed by counsel and the government at this hearing for sentencing purposes, the Court is going to attribute to the defendant for purposes of sentencing, and in line with Count 1 of the indictment, at least 15 but not more than 50 kilograms of cocaine, and two kilograms [of] heroin.

Applying that finding to the applicable sentencing guideline resulted in a base offense level of 34. *See* U.S.S.G. § 2D1.1(c). It also found that he possessed a dangerous weapon on at least one occasion during trafficking and adjusted the base offense level upward two points, as suggested in the presentence report. *See* U.S.S.G. § 2D1.1(b)(1). Additionally, it found that Falú–González had a criminal history category of II. Accordingly, with a base offense level of 36 and a criminal history category of II, Falú–González was sentenced to imprisonment of 262 months. *See* U.S.S.G. ch. 5 pt. A.

■ When given a chance to respond after the sentence was delivered, Falú–González's attorney did not request more specific findings concerning the drug amounts attributed to Falú–González. Now, on appeal, Falú–González challenges for the first time the district court's drug-quantity findings based on a failure to make "the required factual sentencing

findings concerning drug amounts"; that is, "he did not make any factual determination as to how he arrived at that amount." Usually, we review quantity findings for clear error. *See United States v. Rivera–Maldonado*, 194 F.3d 224, 228 n. 2 (1st Cir.1999); *United States v. Whiting*, 28 F.3d 1296, 1304 (1st Cir.1994). At sentencing, Falú–González called into question the drug-quantity recommendation of the presentence report. However, once the district court made its drug-quantity findings, Falú–González only objected that the district court held him responsible for heroin. He did not request more specific findings regarding the amounts of drugs attributed to him.

■ "It is a general principle of appellate jurisprudence that a party desiring more particularized findings at the trial court level must request them from the trial court." *United States v. Tosca*, 18 F.3d 1352, 1355 (6th Cir.1994) (deeming as waived argument that findings at sentencing were not specific); *see also United States v. Krankel*, 164 F.3d 1046, 1055 n. 3 (7th Cir.1998) (same); *United States v. Riebold*, 135 F.3d 1226, 1231–32 (8th Cir. 1998). We repeatedly invoke the "raise or waive" rule, including in the sentencing context: "Issues not squarely raised in the district court will not be entertained on appeal.... Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out his arguments squarely and distinctly, or else forever hold his peace." *United States v. Barnett*, 989 F.2d 546, 554 (1st Cir.1993) (internal citations, quotations, and alterations omitted); *see also United States v. Levy–Cordero*, 67 F.3d 1002, 1019 (1st Cir.1995); *United States v. Slade*, 980 F.2d 27, 30 (1st Cir.1992) (collecting cases); *United States v. Haggert*, 980 F.2d 8, 10–11 (1st Cir.1992) (collecting cases); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990).

We recognize the dramatic effect on sentencing that a drug-quantity finding has, and we have vacated a defendant's sentence and remanded for more specific findings on drug quantity. *See, e.g., United*

*States v. Marrero–Ortiz*, 160 F.3d 768, 779–80 (1st Cir.1998); *United States v. Sepúlveda*, 15 F.3d 1161, 1198–99 (1st Cir. 1993). However, a remand consistent with our cases discussed earlier occurs "[i]n the face of timely objection." *Sepúlveda*, 15 F.3d at 1199. Because Falú–González failed to challenge the specificity of the district court's drug-quantity findings at sentencing, he waived that argument on appeal. If he was dissatisfied with the district court's drug-quantity findings, or was unclear as to how it arrived at those findings, he should have requested more specific findings at that time, rather than remain silent and postpone his challenge of the district court's findings until appeal.

■ The "raise or waive" rule is only relaxed "in exceptional cases involving a gross miscarriage of justice where the belated claim is 'so compelling as virtually to insure appellant's success.'" *Barnett*, 989 F.2d at 554 n. 8, *quoting Haggert*, 980 F.2d at 11. That is not the case here.

Government witnesses testified that Falú–González supplied drugs to the Solano–Moreta organization, that on one occasion Falú–González sold one kilogram of cocaine to Solano–Moreta for $13,500, that Solano–Moreta said that Falú–González supplied the organization with "kilos" of cocaine, that Falú–González was a drug supplier to the Solano–Moreta organization, that Falú–González was seen with Solano–Moreta on other occasions, and that Falú–González was called three or four times to ask whether he had drugs to sell the organization. There were also audiotape conversations between Falú–González and Solano–Moreta discussing drug-related activities. Thus, there is evidence linking Falú–González to the drug trafficking occurring in the Solano–Moreta organization and to "kilos" of cocaine.

In addition to drugs Falú–González personally trafficked, the evidence showed he was involved in the drug conspiracy and therefore is responsible, "under the relevant conduct rubric, for drugs involved in additional acts that were reasonably fore-

seeable by him and were committed in furtherance of the conspiracy." *Sepúlveda,* 15 F.3d at 1197.

In light of this evidence, the district court's drug-quantity findings are not a gross injustice and cannot be an exception to the "raise or waive" rule.

## IV.

Falú–González next argues that the district court erred in denying his motion for new trial brought pursuant to Rule 33 of the Federal Rules of Criminal Procedure based on newly discovered evidence. He alleges that a recorded telephone conversation in which he participated actually occurred prior to the court authorization secured pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–22 (Title III). We first set out the relevant facts.

During its investigation of the Solano–Moreta organization, the government obtained a wiretap authorization pursuant to Title III to monitor, from April 19 to May 19, 1995, a cellular telephone Solano–Moreta used. After monitoring the telephone for ten days, the FBI sent a letter to the U.S. Attorney, dated April 28, 1995, describing the results of the intercept. Attached to the letter were handwritten FBI monitoring logs and summaries of the calls intercepted. Three calls, among others, relating to Falú–González were described: call number 104, made April 20, 1995; call number 130, made April 21, 1995; and call 245, made April 25, 1995. It is unclear from the record whether this letter was given to Falú–González during pretrial discovery.

Based upon the FBI letter, the government filed a motion in district court on May 1, 1995, pursuant to 18 U.S.C. § 2518(6), presenting a "ten day summary" of the wiretap covering "the period of Wednesday, April 19, [1995] to Thursday, April 27, 1995." At the end of the motion, the government states that continued interception of the cellular telephone was unnecessary because it "has not been used since Monday, April 24, 1995." Attached to the motion were logs and summaries of all calls intercepted, including at least one call—number 245—stated to be made after April 24. On July 6, 1996, during discovery in this case, Falú–González received a copy of this motion and FBI translations of all the intercepted calls, including calls 104, 130, and 245. The times at which the FBI intercepted those calls were listed as follows: call number 104, recorded April 20, 1995, at 10:51 p.m.; call number 130, recorded April 21, 1995, at 2:04 a.m.; and call 245, recorded April 25, 1995, at midnight.

Before trial, the district court held a *Carbone* hearing to determine the admissibility of the tape recordings of telephone conversations made during the Title III intercept. *See United States v. Carbone,* 798 F.2d 21, 24–25 (1st Cir.1986). Falú–González did not object to the admissibility of the tapes either at the *Carbone* hearing or during trial.

At trial, numerous taped telephone conversations obtained during the intercept, including calls 104, 130, and 245, were admitted into evidence and played for the jury. In fact, Falú–González testified during the trial about calls 104, 130, and 245, and tried to explain away any evidence from those calls that he supplied drugs to Solano–Moreta. He testified that he met Solano–Moreta in 1994 and that his relationship with him revolved around encouraging Solano–Moreta to donate money for a music video starring Falo, a local musician, in which he appeared. Falú–González never questioned the dates on which the FBI indicated calls 104, 130, and 245 occurred, despite the fact that Falú–González testified that he participated in each of those calls.

After trial but before sentencing, Falú–González filed a motion for new trial pursuant to Rule 33 based upon (1) newly discovered evidence that calls 104, 130, and 245 were obtained outside the time period for which the Title III intercept was granted and (2) prosecutorial misconduct. He also argued that the district court should

grant a new trial based upon the court's supervisory powers because of the government's alleged bad faith and misconduct during discovery and trial.

The district court held two evidentiary hearings on the motion. Falú–González introduced evidence that calls 104, 130, and 245 did not actually occur at the time the government translations indicate. He called John Faulds, a private investigator with experience reviewing Title III intercept cases. Faulds compared several types of documents, each stating the times these calls could have been made: billing records subpoenaed after trial from Cellulares Telephonica, the cellular telephone division of the Puerto Rico Telephone Company, FBI translations of calls 104, 130, and 245, and FBI "pen registers" (printouts from electronic devices installed by the telephone company during Title III intercepts indicating activity on a telephone line). Faulds testified that the times indicated on the FBI translations of calls 104, 130, and 245 did not correspond with any calls listed on the cellular billing records; however, he conceded that the FBI pen register, created with machinery the telephone company installed, corroborated the times indicated on the translations. Faulds also pointed out discrepancies between the government's May 1 motion and the time designations in the FBI translations: the motion indicated that no telephone calls were made after Monday, April 24, 1995, but the FBI translation of call 245 states it was recorded April 25 shortly after midnight.

Falú–González did not introduce evidence concerning the actual timing of calls 104 and 130, resting instead on the fact that the calls did not occur when the FBI said they did. However, he did attempt to place call 245 outside the authorized Title III intercept period. In that call, Falú–González stated: "Today I came out in a video of Falo." Falo testified at the hearing that the music video was shot over a period of three to five days in April 1995, but he did not testify more specifically when in April filming occurred. José Torres, Falo's producer, testified that, "to the best of my knowledge," filming occurred between April 11 and 14. This would be before the authorized Title III period. However, when the district court asked whether he had documentary evidence corroborating those dates, he admitted he did not and that his testimony was based on his recollection.

Additionally, Héctor Rosa–Hernández, supervisor of internal security at Puerto Rico Telephone Company, testified that, according to the Company's records, the cellular telephone that was the subject of the Title III intercept in this case was disconnected between April 23 and May 4, suggesting that call 245 could not have been made on April 25.

In a written opinion, the court denied the motion for new trial. The district court held that: (1) the "new" evidence could have been discovered previously with due diligence; (2) there is no basis to Falú–González's contention that government misconduct tainted the Title III intercept; (3) a new trial would not result in acquittal; and (4) the circumstances of the case do not warrant a new trial pursuant to the court's supervisory powers.

■■■ Pursuant to Rule 33, a district court may:

> grant a new trial "if required in the interest of justice." Where, as here, the motion is based on new or previously unavailable evidence, the defendant has to establish that "the evidence was: (i) unknown or unavailable at the time of trial, (ii) despite due diligence, (iii) material, and (iv) likely to result in an acquittal upon retrial."

*United States v. Montilla–Rivera,* 115 F.3d 1060, 1064–65 (1st Cir.1997) (footnote omitted), *quoting* Fed.R.Crim.P. 33. "If any of the four factors ... are lacking, then a Rule 33 motion must be denied." *United States v. Natanel,* 938 F.2d 302, 313 (1st Cir.1991). We review the denial of a Rule 33 motion for manifest abuse of discretion. *See Montilla–Rivera,* 115 F.3d

at 1064, *citing United States v. Andrade,* 94 F.3d 9, 14 (1st Cir.1996). We give considerable deference to the district court's "broad power to weigh the evidence and assess the credibility of both the witnesses who testified at trial and those whose testimony constitutes 'new' evidence." *Montilla–Rivera,* 115 F.3d at 1067.

 For the first time on appeal, Falú–González argues that we should apply a less stringent new trial standard because of prosecutorial misconduct in withholding evidence that calls 104, 130, and 245 did not occur when the FBI stated. He has waived this argument by failing to raise it in the district court. *See Barnett,* 989 F.2d at 554.

We need go no farther than the district court's first reason for denying Falú–González's Rule 33 motion: the "new" evidence about a call time discrepancy could have been discovered with due diligence and was thus not "new." There are two reasons why Falú–González could have discovered any discrepancy before the conclusion of trial. First, he participated in the telephone conversations. Information surrounding a defendant's own conversations rarely qualifies as newly discovered evidence. *See United States v. DeLuca,* 137 F.3d 24, 40 (1st Cir.1998). While it is true that persons may not remember each telephone call in which they participate, especially several years after the fact, call 245 discusses a particularly memorable event for Falú–González, the filming of a music video that would appear on television. After trial, he seemed to remember clearly that this event took place earlier in April than the FBI logs indicated, and he found another person related to the video who corroborated his recollection. All this he should have known prior to the conclusion of trial and that precludes his request for a new trial.

Second, Falú–González received discovery indicating a possible discrepancy in call times with ample time to notice the discrepancy and investigate it. Falú–González concedes that on July 6, 1996, during discovery, he received the government's May 1, 1995, motion, which states that no calls were made on Solano–Moreta's cellular telephone after Monday, April 24, 1995. He also admits receiving the FBI translation of call 245, which plainly states that the FBI purportedly recorded that call at midnight on April 25. At that time, Falú–González could have noticed this discrepancy, summoned supporting evidence (e.g. the cellular telephone billing records that he successfully, but tardily, subpoenaed after trial) and presented this argument. However, he apparently failed to review adequately the documentary evidence and recognize the discrepancy; he failed to object at the *Carbone* hearing regarding the admissibility of the audiotaped evidence; and he failed to object at trial. Not only did he fail to object at trial, but he relied upon the dates and times at which the FBI purported the calls to have occurred during his own testimony.

Falú–González had time to notice the discrepancy in the government's documents and investigate it: there was a period of six to thirteen days from the time he received the wiretap evidence (July 6) to the time the *Carbone* hearing occurred (July 12, 15, and 19), and one month from discovery to when he testified (August 5). With due diligence, he could have subpoenaed the cellular telephone records and presented an argument before the district court that the dates and times did not match up.

The district court can grant a Rule 33 motion only when evidence discovered after trial could not have been uncovered, with due diligence, before trial. *See* Fed. R.Crim.P. 33; *Montilla–Rivera,* 115 F.3d at 1064. Since Falú–González did not establish the first of the four Rule 33 requirements, there was no manifest abuse of discretion when the district court denied his motion. *See DeLuca,* 137 F.3d at 40.

**V.**

 Falú–González also contends that the district court erred in instructing

the jury that cooperating witnesses' guilty pleas were not "in and of itself" evidence of their guilt. He admits he did not object to the instruction at trial; thus, we review for plain error. *See United States v. González–González,* 136 F.3d 6, 10 (1st Cir. 1998).

The district court instructed the jury:

The testimony of some witnesses must be considered with more caution than the testimony of another witness.

In this case, the government called as witnesses, amongst others, ... [certain] persons named as co-defendants in the indictment, with whom the government has entered into a plea agreement providing for the dismissal of some charges and a promise of a lesser sentence that [sic] the witness would otherwise be exposed to for the offense to which he pled guilty. Such plea bargaining, as it's called, has been approved as lawful and proper, and is expressly provided for by the rules of this Court.

So, while a witness of that kind may be entirely truthful when testifying, you should consider his testimony with more caution than the testimony of other witnesses. And, of course, the fact that a witness has pled guilty to the crime charged in the indictment is not evidence, *in and of itself* of the guilt of any other person.

(Emphasis added.) The problem with the emphasized portion of the instruction above, according to Falú–González, is that it implies that the jury could use the guilty pleas, in conjunction with other trial evidence, to convict him.

■ We examined an identical argument in *González–González,* 136 F.3d at 11, and discouraged the use of the words "in and of itself" in jury instructions that explain the weight to be given cooperating witnesses' testimony. We repeat now that such language is unnecessary and "potentially misleading." *Id.* However, the use of "in and of itself" in the jury instructions is not plain error in this case.

■ In *González–González* we affirmed the defendant's conviction because the jury instructions, as a whole, "repeatedly and unequivocally told the jury not to consider the co-defendant's guilty plea as evidence of the defendant's guilt." 136 F.3d at 11. That is also true in this case. "We examine jury instructions in the context of the charge as a whole to determine whether the court's instructions require a new trial." *Id., citing United States v. Rose,* 104 F.3d 1408, 1416 (1st Cir.1997). In addition to the above cooperating witness instruction, the district court instructed the jury:

Now, this case has now been disposed of as to some defendants. They are no longer of concern to you and you should not speculate as to the reasons for this occurrence.

This disposition should not control or influence your verdict with reference to these remaining defendants and you must base your verdict solely on the evidence received.

Additionally, the jury was instructed:

Here we have multiple defendants. The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendant.

These instructions are similar to the additional instructions that convinced us in *González–González* to affirm the conviction. *See* 136 F.3d at 11 n. 5. These instructions focused the jury's attention on the specific evidence regarding each individual defendant and emphasized that the disposition of one defendant's case was not to influence or control their verdicts as to other defendants. Thus, as in *González–González,* we are convinced that the inclusion of "in and of itself" in the cooperating witness instruction, in the context of the jury charge as a whole, does not warrant reversal of Falú–González's conviction. *See* 136 F.3d at 11–12.

VI.

Falú–González raises one final argument: that pursuant to 18 U.S.C. § 201(c)(2), his conviction should be reversed because it was obtained through the use of cooperating witnesses who were offered reductions in sentences if they would testify for the government. He concedes we must review for plain error because he did not object at trial. *See González–González*, 136 F.3d at 10. Section 201(c)(2) states in part:

> Whoever directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court . . . shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2).

Recently, in *United States v. Lara*, 181 F.3d 183, 197–98 (1st Cir.1999), we rejected this argument outright, relying on the decisions of several other courts of appeals. *Lara* is controlling here. We only add that since *Lara* was decided, several additional courts of appeals have joined us in holding that section 201(c)(2) does not prohibit the government from offering leniency to cooperating witnesses. *See United States v. Hunte*, 193 F.3d 173, 174 (3d Cir.1999); *United States v. Mattarolo*, 191 F.3d 1082, 1089 (9th Cir.1999); *United States v. Stephenson*, 183 F.3d 110, 118 (2d Cir.1999). Indeed, this is now the holding of "every other circuit court that has considered the issue." *Hunte*, 193 F.3d at 174; *see also United States v. Smith*, 196 F.3d 1034, 1038 (9th Cir.1999).

**AFFIRMED.**